UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------x
ZSA ZSA JEWELS, INC.,

                    Plaintiff,                          MEMORANDUM AND ORDER
                                                       15-CV-6519 (ILG) (RLM)

     *v.*


BMW OF NORTH AMERICA, LLC; BRIDGESTONE
AMERICAS TIRE OPERATIONS, LLC; MORRIS
COUNTY AUTO SALES, INC. A/K/A BMW OF
MORRISTOWN; and OPEN ROAD OF EDISON, INC.
A/K/A OPEN ROAD BMW,

                    Defendants.
---------------------------------------------------------------------x
GLASSER, Senior United States District Judge:

       On November 13, 2015, Plaintiff Zsa Zsa Jewels, Inc. (**"Plaintiff"** or **"Zsa Zsa Jewels"**)

commenced this products liability action[1] against Defendants BMW of North America, LLC

(**"BMW"**); Bridgestone Americas Tire Operations, LLC (**"Bridgestone"**); Morris County Auto

Sales, Inc. a/k/a BMW of Morristown (**"BMW of Morristown"**); and Open Road of Edison, Inc.

a/k/a Open Road BMW (**"Open Road"**). (*See* Compl., ECF No. 1). Plaintiff amended the

complaint on June 14, 2016 (*see* Am. Compl., ECF No. 32), and later voluntarily dismissed its

claims against Bridgestone, BMW of Morristown, and Open Road pursuant to Federal Rule of

Civil Procedure 41(a)(1)(A)(ii) (*see* ECF Nos. 82, 85). The only remaining Defendant is BMW,

hereinafter referred to as **"Defendant"**.

       Pending before the Court are Defendant's motions: (i) to preclude the testimony of

Plaintiff's proposed expert, Peter J. Leiss (**"Leiss"**), under Federal Rule of Evidence 702; (ii) for

---

[1] Plaintiff's original complaint contained additional claims for breach of express and implied
warranty, which were subsequently dropped in its amended complaint.

summary judgment; and (iii) for sanctions under Federal Rule of Civil Procedure 11. (*See* ECF No. 86). For the reasons that follow, Defendant's motion to preclude expert testimony is granted; Defendant's motion for summary judgment is granted in part and denied in part; and Defendant's motion for sanctions is denied without prejudice.

## STANDARD OF REVIEW

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the case under governing law." *Fireman's Fund Ins. Co. v. Great American Ins. Co. of New York*, 822 F.3d 620, 631 n. 12 (2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Id.* (quoting *Anderson*, 477 U.S. at 248). "In making this determination, the Court 'must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant.' " *Id.* (quoting *Beyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008)); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. " 'The evidence of the non-movant is to be believed' to the extent that a jury could reasonably believe it." *Grant v. City of New York*, 15-CV-3635 (ILG) (ST), 2019 WL 1099945, at *4 (E.D.N.Y. Mar. 8, 2019) (quoting *Anderson*, 477 U.S. at 255). "Conversely, 'the court ... must disregard all evidence favorable to the moving party that the jury is not required to believe.' " *Id.* (quoting *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000)).

# BACKGROUND

Plaintiff is a New York corporation that "design[s], produc[es], and sell[s] hand-crafted jewelry." (Am. Compl. ¶¶ 3, 8). In 2011, Plaintiff's sole owner, Meena Catalano (**"Catalano"**), leased a 2012 BMW X3 designed and manufactured by Defendant (the **"Subject Vehicle"** or the **"Vehicle"**) from BMW of Morristown in Morristown, New Jersey. (*See* Def. 56.1 SOF ¶ 1, ECF No. 86-1; Def. Ex. B, ECF No. 86-5; Catalano Dep. at 37:9-10).[2] On November 6, 2013, the Vehicle caught fire while it was being driven by Plaintiff's employee, Tiffany Sobers (**"Sobers"**), resulting in the destruction of inventory that the Vehicle was transporting. (*See* Def. 56.1 SOF ¶¶ 3-18). The fire originated in the Vehicle's right rear tire and was caused by a lack of adequate air pressure in the tire. (*See id.* ¶¶ 26, 34). Sobers testified that she did not see any low tire pressure warnings on the dashboard prior to the fire. (*See* Sobers Dep. at 226:3-15). Plaintiff alleges that the 2012 BMW X3's built-in tire pressure monitoring system (**"TPMS"**) is defectively designed and/or manufactured because, under certain conditions, it may fail to warn that the vehicle's tires have inadequate pressure. Plaintiff further alleges that this defect caused the fire because it resulted in Sobers being unaware that the Vehicle's tire did not have adequate pressure—the reasonable implication being that, had Sobers seen the warning, she would have stopped driving before the low tire pressure condition caused the fire.

---

[2] For purposes of summary judgment, statements in a movant's statement of undisputed material facts pursuant to Local Civil Rule 56.1(a) are deemed admitted to the extent that they are: (1) followed by citation to evidence which may be considered on summary judgment pursuant to Federal Rule of Civil Procedure 56(c); and (2) not "specifically controverted by a correspondingly numbered paragraph" in the nonmovant's counterstatement under Local Civil Rule 56.1(b). *See* Local Civil Rule 56.1(c), (d).

## I.      The 2012 BMW X3 Tire Pressure Monitoring System

Before turning to the facts of this case, it is necessary to review some background information concerning tire pressure monitoring systems.

A TPMS is a system required to be installed on most passenger cars pursuant to Federal Motor Vehicle Safety Standard 138 (**"FMVSS 138"**) (codified at 49 C.F.R. § 571.138), which warns the operator of a vehicle if there is a significant loss of tire pressure by illuminating a warning telltale located in view of the driver. Tire pressure monitoring systems are a necessary component of automotive safety when driving with "run flat" tires, which, as their name suggests, enable the vehicle to continue to be driven for limited distances even if deflated. This is because a driver cannot tell just by looking at a run flat tire whether the tire is low on air pressure. (*See* Leiss Dep. at 226:3-11).

Under FMVSS 138, a TPMS must activate a warning if the pressure in any tire descends to a level that is equal to or less than *either* of the following: (1) a fixed minimum which, for passenger vehicles, is either 20 or 23 psi (pounds per square inch), *see* FMVSS 138 S4.2(a) & Table 1 (the **"Minimum Activation Rule"**); or (2) 75% of the manufacturer's recommended cold inflation pressure, *see id.* S4.2(a) (the **"75% Rule"**). It is undisputed that the design of the TPMS installed in the 2012 BMW X3 (the **"TPMS Design"**) complies with the Minimum Activation Rule, as it will display a warning if the pressure in any tire descends to 23 psi or below. (*See* Yeldham Supp. Rep. at 2).[3] Plaintiff contends, however, that the TPMS Design does

---

[3] Many key facts in the record are provided in the supplemental report of Defendant's expert, Mark Yeldham. Although the record must be evaluated "in the light most favorable to the non-moving party" on summary judgment, *Fireman's Fund*, 822 F.3d at 631 n. 12; *Beyer*, 524 F.3d at 163, statements of fact by an expert may be deemed undisputed where the non-movant has failed to counter them with specific evidence. *See U.S. v. Donovan*, 661 F.3d 174, 186-188 (3d Cir. 2011), *cert. denied*, 566 U.S. 990 (2012); *Pelphrey v. U.S.*, 674 F.2d 243, 247-248 (4th Cir. 1982); *Estate of Thomas v. Fayette County*, 194 F.Supp.3d 358, 365-369 (W.D. Pa. 2016).

not comply with the 75% Rule because its manual "reset" feature theoretically allows the driver to operate the vehicle without seeing a low pressure warning, even while the pressure existing in the tires is less than 75% of the recommended cold inflation level.

A manual "reset" feature is a feature installed on the 2012 BMW X3 that permits the driver to inform the computerized TPMS that the pressure level currently existing in the tires should be accepted as the new baseline. (*See* Yeldham Supp. Rep. at 2). If the TPMS is reset while the tires are at a certain pressure level, deviations from that pressure level that are greater than 25% will trigger a new warning, in accordance with the 75% Rule. (*See* Yeldham Supp. Rep. at 2). For example, if the TPMS is reset while the tires on the vehicle have a pressure level of 35 psi, then, in accordance with the 75% Rule, the system will trigger a low tire pressure warning when the pressure in any one of those tires drops to 26.25 psi, which is 75% of 35 psi. (*See id.*). If there is a loss of tire pressure triggering a warning, merely re-inflating the tire will not extinguish the warning; the system must be reset after the tire is re-inflated for the warning to go away. (*See* Leiss Rep. at 6, Def. Ex. P, ECF No. 86-19 at 9; Leiss Dep. at 136:3-6).[4]

In accordance with the Minimum Activation Rule, the TPMS will continue to display a low pressure warning if the pressure in any tire is less than 23 psi or below, even if the system is manually reset. (*See* Yeldham Supp. Rep. at 2). However, for pressure levels above 23 psi, it is possible for a driver to manually reset the TPMS before having re-inflated the tires to their proper pressure—even if the tire pressure is less than 75% of the recommended cold inflation pressure level. If one resets the system in this manner, it will inform the system that the

---

[4] To reset the TPMS in the 2012 BMW X3, the driver must first follow a series of commands on the computerized entertainment screen located inside the vehicle. (*See* Owner's Manual at 89, Def. Ex. U, ECF No. 86-24 at 4). The driver must then drive "for a few minutes," and the "resetting process is completed automatically during driving." (*Id.*).

underinflated pressure level should be accepted as the new baseline, allowing the operator to resume driving without seeing a warning light. (*See* Leiss Rep. at 6-11, 14; Yeldham Supp. Rep. at 2). What this means, in plain English, is that, for pressure levels above 23 psi, the reset function can theoretically be used as a kind of 'off-switch,' allowing the driver to shut off the warning telltale even when the 75% Rule would require it to be displayed. For this reason, the 2012 BMW X3 Owner's Manual explicitly instructs operators to reset the system only *after* the tire pressure is restored to its correct level; "otherwise, reliable signaling of a flat tire is not ensured." (Owner's Manual at 88; *see* Yeldham Supp. Rep. at 2).

Leiss demonstrated how the 2012 BMW X3's reset feature can be used as a kind of TPMS 'off-switch' by testing an exemplar 2012 BMW X3. First, Leiss deflated the test vehicle's left rear tire to 25 psi, which triggered a low tire pressure warning. (*See* Leiss Rep. at 8).[5] Next, Leiss manually reset the test vehicle's TPMS without re-inflating the left rear tire (*see id*. at 10), which caused the vehicle to accept 25 psi as the new baseline (*see* Yeldham Supp. Rep. at 2). Leiss conceded that this procedure violated the instructions contained in the Owner's Manual. (*See* Leiss Dep. at 151:23-152:4; Owner's Manual at 88). Finally, after resetting the TPMS, Leiss was able to drive the vehicle for an additional hour, while the left rear tire pressure remained at 25 psi, without the warning telltale coming back on. (*See* Leiss Rep. at 10). In short, Leiss found that "[t]he TPMS in the 2012 BMW X3 can be reset without inflating a tire to the proper pressure," and that, "[w]hen the TPMS in the 2012 BMW X3 is reset without inflating the tire with low pressure to the proper pressure the system will not detect that the tire has inadequate

---

[5] The test vehicle was equipped with 245/50 R18 tires, which have a recommended cold inflation pressure of 35 psi for the rear tires. (*See* Pl. Ex. 3, ECF No. 90-3; Owner's Manual at 222, Pl. Ex. 4, ECF No. 90-4). Thus, the test vehicle's TPMS, if initialized correctly, should have illuminated a warning if the pressure in either of the rear tires dropped to 26.25 or below.

tire pressure." (*Id.* at 14). Defendant essentially concedes that the 2012 BMW X3's TPMS works this way, with the caveat that, in accordance with the Minimum Activation Rule, the warning will activate, regardless of any attempt to manually reset the system, if the tire pressure drops to 23 psi or below. (*See* Yeldham Supp. Rep. at 2).

## II. The November 6, 2013 Fire

On November 6, 2013, Sobers was driving the Subject Vehicle from Plaintiff's office in New York City to a jewelry trade show in Marlborough, Massachusetts. (*See* Def. 56.1 SOF ¶ 3). The Vehicle was loaded with jewelry that Plaintiff intended to sell at the trade show. (*See id.* ¶ 4). While en route in the vicinity of Southbury, Connecticut, Sobers experienced difficulty steering the Vehicle and pulled over to the shoulder of the road. (*See id.* ¶¶ 12-13). While Sobers was attempting to dial for help, a passing truck driver pulled over and told her to get out of the car, as it was on fire. (*See id.* ¶¶ 15-16). Sobers looked in the right mirror and saw smoke and flames. (*See* Sobers Dep. at 177:8-10). Fortunately, she was able to exit the Vehicle safely. (*See* Def. 56.1 SOF ¶ 17). However, by the time Connecticut State Troopers arrived at the scene, the Vehicle was "fully engulfed in flames," and the jewelry inside the Vehicle had been damaged. (Investigation Report at 1-3, Def. Ex. G, ECF No. 86-10 at 2-3; *see* Yeldham Rep. at 2-6, Def. Ex. O, ECF N. 86-18 at 5-9 (photographs showing significant damage to the Vehicle and jewelry)).

After the fire, the Vehicle was inspected at the facilities of S. Dennis Lyons, a fire origin and causation expert whose qualifications are not disputed. (*See* Def. 56.1 SOF ¶ 19). Lyons found that the cause of the fire was a loss of pressure in the Vehicle's right rear tire, which caused the tire to "shred apart and [catch] fire due to the high degree of friction." (Lyons Rep. at 4, Def. Ex. M, ECF No. 86-16 at 7; *see* Def. 56.1 SOF ¶¶ 26, 34; Yeldham Rep. at 12, Def. Ex.

O, ECF No. 86-18 at 15). Sobers testified that, prior to the accident, she did not observe a low tire pressure warning on the dashboard. (*See* Sobers Dep. at 226:3-15). It is not known why the tire became deflated or what the actual air pressure was in the tire at the time of the accident. However, Defendant's expert concluded that "the tire must have been deflated for an extended period of time." (Yeldham Rep. at 12). In February 2014, after Plaintiff's counsel failed to pay for storage fees, the Vehicle was sold and crushed, making it impossible to conduct any more inspections. (*See* Def. 56.1 SOF ¶ 24).

### III.    Expert Opinions Concerning Product Defect and Causation

As previously noted, the parties agree that it is possible for a driver to reset the TPMS at a low tire pressure, thereby permitting a driver to operate the vehicle with low pressure tires without seeing a warning. (*See* Leiss Rep. at 14; Yeldham Supp. Rep. at 2). They disagree, however, about whether this feature was the actual cause of the fire and whether it constitutes a design defect in the first place. This disagreement largely plays out through the differing opinions of Plaintiff's expert, Leiss, and Defendant's expert, Mark Yeldham (**"Yeldham"**).

### 1.    Evidence concerning causation

Leiss' theory of the accident is evidently that, at some point before the fire, the Subject Vehicle's TPMS was reset at a low tire pressure, making it possible for Sobers to drive the Vehicle with a deflated tire without seeing a warning. Specifically, Leiss testified that the TPMS "may have" been improperly reset when the Vehicle was serviced at an Open Road BMW on October 1, 2012, approximately 13 months before the fire. (Leiss Dep. at 173:25-4). The record shows that the Vehicle was taken in to the Open Road on that date after the dashboard emitted a low tire pressure warning. (*See* Catalano Dep. at 111:10-113:5). The tire was re-inflated at the service station, and the TPMS was reset. (*See* Boehler Dep. at 110:4-23; Def. Ex. R at 4, ECF

No. 86-21). The service record states: "CORRECTION: SET TIRE PRESSURE AND RESET TPM." (Def. Ex. R at 4). There is no indication that any of the tires were deflated when the system was reset. Nevertheless, Leiss concluded, apparently based solely on the assumption that the TPMS was improperly reset when it was taken in on October 2012, that the ability to extinguish the low pressure warning by resetting the TPMS at a low tire pressure was "a cause of the fire." (Leiss Rep. at 14; *see* Leiss Dep. at 173:11-176:21). Leiss conceded that he was aware of no evidence that Catalano or Sobers themselves ever reset the Vehicle's TPMS. (*See* Leiss Dep. at 173:5-10).

Defendant proposes only a single, alternative explanation for the cause of the fire: that the low tire pressure warning did go on, as it was supposed to, but that Sobers simply ignored it. (*See* Def. Mem. at 15-17, ECF No. 86-2, at 20-22; Def. Reply at 6-7, ECF No. 93, at 9-10). In his report, Yeldham states that:

> What must be considered is the possibility that the driver may have become inattentive due to factors such as extend [*sic*] highway driving time and phone call interruptions. In my professional experience, there are many incidents in which the driver fails to become aware of warning lamps accompanied by audible warnings due to fatigue or distractions. … Additionally many customers do not want to admit that they may have been inattentive and insist that no warning indicators were activated.

(Yeldham Rep. at 11). Yeldham notes further that "we have no reason to believe that the Tire Pressure Monitoring system was not functioning properly" at the time of the incident. (*Id.*). In essence, Defendant seeks to sow doubt as to the credibility and veracity of Sobers' testimony. Defendant refers to various pieces of circumstantial evidence which, it contends, is indicative that Sobers disregarded the warning: (i) "Sobers was operating the Vehicle at a speed of 66-99 mph in the 30-45 minutes prior to the fire" (Def. Reply at 6 (citing Def. 56.1 ¶ 14)); (ii) "Sobers was on the phone for 29 minutes with [Catalano] while driving, right up to the time of the

incident" (*id.* (citing Def. 56.1 ¶¶ 10, 11, 17)); and (iii) Sobers' statements to Lyons and

Connecticut State Trooper Joshua A. Sawyer were purportedly "inconsisten[t]" as to whether she

saw a low coolant light (*id.* (citing Lyons Dep. at 90:15-93:20, 184:13-185:6; Victim/Witness

Statement, Def. Ex. G, at 6)). Critically, Defendant does *not* explain how the warning light could

have failed to turn on even in the absence of a defect; it simply argues that the warning light did

turn on and that Sobers' testimony to the contrary is incorrect.

       2.    <u>Evidence concerning defectiveness</u>

Leiss opines that, because the TPMS can be reset without inflating a tire to its proper

pressure, enabling the driver to operate the vehicle with deflated tires without seeing a low tire

pressure warning, the TPMS Design is "defective." (Leiss Rep. at 14). He claims that this design

contravenes FMVSS 138 (*see id.* at 12), but that, even if it were deemed to comply with FMVSS

138, it nevertheless falls short of the "industry standard" (Leiss Dep. at 220:3-20). According to

Leiss, Defendant could have employed an alternative design, which would have "identifie[d] an

inadequately inflated tire under all conditions." (Leiss Rep. at 12). Specifically, Leiss claims that

Defendant could have designed a TPMS without a manual reset feature; he notes that "the vast

majority of models that I know of and am familiar with … do not have a manual reset feature"

(Leiss Dep. at 241:13-16), offering the 2007 Dodge Durango and 2007 Chrysler Aspen as two

examples of vehicles whose TPMS systems did not incorporate a reset feature (*see* Leiss Rep. at

12). Alternatively, Leiss claims that Defendant could have designed a manual reset feature that

would alert the driver to an underinflated tire, even if the system were reset at a low pressure

level. (*See id.* at 12-13). According to Leiss, "[e]ither of these systems were technologically and

economically feasible to be installed on the 2012 BMW X3." (*Id.* at 13).

In response, Defendant argues that the ability to manually reset the 2012 BMW X3 TPMS is a feature, not a flaw. Yeldham states that the manual reset feature "is incorporated into the TPMS of the 2012 BMW X3, because this vehicle is offered in several wheel/tire combinations, which do not all have the same recommended cold inflation pressures." (*See id.*; *see also* Owner's Manual at 222, Pl. Ex. 4, ECF No. 90-4 (displaying different recommended cold inflation pressures for different wheel/tire combinations in the 2012 BMW X3)).[6] Defendant also emphasizes that the 2012 BMW X3 Owner's Manual instructs operators to reset the system only after the tire pressure is restored to its correct level. (*See* Owner's Manual at 88; Yeldham Supp. Rep. at 2). Finally, Defendant claims that, notwithstanding Plaintiff's arguments to the contrary, the TPMD Design, including its manual reset feature, complies with FMVSS 138.

## IV. Circumstantial Evidence That the Fire Was Caused by a Defect in the TPMS

As an alternative ground for denial of summary judgment, Plaintiff contends that, under New York law, even if it cannot "prove a specific defect"—that is, even if Leiss' proffered opinions are excluded or otherwise insufficient to show that the fire was caused by a defect in the Vehicle's manual reset feature—it may nevertheless prevail by simply "prov[ing] that the product did not perform as intended and exclud[ing] all other causes for the product's failure that are not attributable to defendants." (Pl. Opp. at 24, ECF No. 90, at 24 (quoting *Church Insurance Company v. Comstock-Castle Stove Company*, No. 15-CV-49 (BKS) (DEP), 2017 WL 1408042,

---

[6] Mark Boehler, the mechanic who serviced the Subject Vehicle at Open Road, suggested that the ability to reset the tire pressure monitoring system at different pressure levels may also be useful to drivers who wish to engage in "extracurricular activities … , such as autocross and/or track racing," which may make it desirable to use tires with a higher or lower pressure than is customary. (Boehler Dep. at 146:18-147:11). However, Boehler has not been submitted as an expert in such matters. Therefore, the Court will not consider his testimony on the utility of the manual reset feature.

at *5 (N.D.N.Y. Feb. 14, 2017) and citing *Speller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38 (N.Y. 2003)). Plaintiff argues that the circumstantial evidence in this case—specifically, Sobers' testimony, which, if credited, would establish that the low tire pressure warning did not illuminate as it was supposed to (*see* Sobers Dep. at 226:3-15)—is sufficient to support an inference that the TPMS was defective and that the defect caused the injury in question. (*See* Pl. Opp. at 24-26).

## DISCUSSION

### I. New York Products Liability[7]

Under New York law, "[o]ne engaged in the business of selling or otherwise distributing products who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect." *Tedone v. H.J. Heinz Co.*, 686 F.Supp.2d 300, 314 (S.D.N.Y. 2009) (quoting Restatement (Third) of Torts: Products Liability (1998) [hereinafter **"Restatement"**] § 1). Thus, to prevail in a products liability action, the plaintiff need only prove (1) "that the product was defective," and (2) "that the defect was a substantial factor in bringing about the injury." *Williams v. Sunnyside Corp.*, No. 08-CV-2339 (FB), 2008 WL 4443227, at *3 (E.D.N.Y. Sept. 3, 2008) (quoting *Wheeler v. Sears Roebuck & Co.*, 37 A.D.3d 710, 710-711 (N.Y. App. Div. 2d Dept. 2007)).

With respect to the first element, three theories of product defect are recognized: defective design, defective manufacturing, and failure-to-warn. *See In re New York City Asbestos*

---

[7] This case presents an arguable issue as to which state's laws should govern. Plaintiff is a New York corporation (*see* Am. Compl. ¶ 8), but the vehicle was leased in New Jersey (*see* Def. Ex. B, ECF No. 86-5), and the fire occurred in Connecticut (*see* Def. 56.1 SOF ¶ 13). Defendant is a Delaware limited liability company having its principal place of business in New Jersey. (*See* Am. Compl. ¶ 10). Regardless, the parties evidently agree that New York law governs, as they cite only New York decisions in their papers. (*See* Def. Mem. at 14-15; Pl. Opp. at 19).

*Litigation*, 27 N.Y.3d 765, 787 (N.Y. 2016); Restatement § 2. Here, Plaintiff's claim, as narrowed by the prior proceedings and by Plaintiff's memorandum in opposition to summary judgment, is that the Vehicle's TPMS was defectively designed and/or defectively manufactured. (*See* Am. Compl. ¶¶ 59-77; Pl. Opp. at 7).[8, 9] *See also Astoria Energy II LLC v. HH Valves Ltd.*, No. 17-CV-5724 (ENV) (RER), 2019 WL 4120759, at *3 (E.D.N.Y. Aug. 2, 2019) ("A plaintiff is entitled to plead claims for both design defect and manufacturing defect in the alternative"). The difference between these two types of claims was summarized by the New York Court of Appeals in *Denny v. Ford Motor Co.*:

> In design defect cases, the alleged product flaw arises from an intentional decision by the manufacturer to configure the product in a particular way. In contrast, in strict products liability cases involving manufacturing defects, the harm arises from the product's failure to perform in the intended manner due to some flaw in the fabrication process.

87 N.Y.2d 248, 257 n. 3 (N.Y. 1995).[10]

---

[8] Plaintiff abandoned any failure-to-warn claim it may have by failing to respond to Defendant's motion for summary judgment with respect to this claim. (*See* Def. Mem. at 17-20; Def. Reply at 7); *Jackson v. Federal Express*, 766 F.3d 189, 197-198 (2d Cir. 2014) (where a party represented by counsel responds to a motion for summary judgment by "referencing some claims … but not others," the court may infer that "the claims … that are not defended have been abandoned").

[9] Defendant asserts in its motion papers that Plaintiff's claim is based solely on design defect (*see* Def. Mem. at 1), and that Plaintiff's manufacturing defect claim was asserted "for the first time" in Plaintiff's opposition memorandum (*see* Def. Reply at 5). Both assertions are incorrect; Plaintiff's manufacturing defect claim is explicitly pleaded in the amended complaint. (*See* Am. Compl. ¶ 61 ("BMW N.A. designed and/or manufactured the BMW X3 with serious and dangerous defects, including but not limited to … [d]efects in the BMW X3's TPMS….")).

[10] Plaintiff bifurcates its causes of action into both "strict liability" and "negligence" claims. (Am. Compl. ¶¶ 59-77). However, there is no practical distinction under New York law between product liability actions premised on negligence and those premised on strict liability. *See Oden v. Boston Scientific Corporation*, 330 F.Supp.3d 877, 887 (E.D.N.Y. 2018) ("Under New York law, a Plaintiff's claim based upon an alleged design defect or manufacturing defect sounding in either negligence or strict liability are functionally equivalent and will be analyzed concurrently") (collecting cases); *see also Adams v. Genie Industries, Inc.*, 14 N.Y.3d 535, 543 (N.Y. 2010).

As relevant to the circumstances of this case, there are two modes of proof available to a plaintiff pleading a design and/or manufacturing defect claim, corresponding roughly to Sections 2 and 3 of the Restatement. First, a plaintiff may attempt to show, generally with the aide of an expert, that there was a specific defect in the design of the product or in its manufacturing process that caused the injury in question. *See* Restatement § 2. In this case, Plaintiff's expert only claims to have identified a specific design defect, as opposed to a manufacturing defect. Second, a plaintiff may prove his or her case circumstantially by showing that the injury was of a kind that ordinarily occurs as a result of a product defect and by excluding other causes of the injury. *See id.* § 3. To prevail under this latter approach, the Plaintiff is not required to specify whether the defect in question was a design defect or a manufacturing defect. *See id.* § 3 cmt b.

We examine the legal standards governing each mode of proof in greater detail below.

1.  Specific design defect

    A.  *Generally*

To prevail on a products liability claim based on a specific design defect, the plaintiff must demonstrate that "(1) the product, as designed, posed a substantial likelihood of harm; (2) that it was feasible for the manufacturer to design the product in a safer manner; and (3) that the defective design was a substantial factor in causing plaintiff's injury." *Hilaire v. DeWalt Indus. Tool Co.*, 54 F.Supp.3d 223, 252 (E.D.N.Y. 2014) (adopting report and recommendation) (quoting *Cuntan v. Hitachi KOKI USA, Ltd.*, No. 06-CV-3898 (RRM) (CLP), 2009 WL 3334364, at *5 (E.D.N.Y. Oct. 2009)); *accord Colon ex rel. Molina v. BIC USA, Inc.*, 199 F.Supp.2d 53, 83 (S.D.N.Y. 2001). The first two elements are usually analyzed together and merge into a single inquiry: whether the product, as designed, was "reasonably safe." *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 107 (N.Y. 1983). New York's approach to design

defect cases is consistent with that of the Restatement, which provides that a product is defectively designed if:

> … the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design … and the omission of the alternative design renders the product not reasonably safe[.]

Restatement § 2(b). The test, in other words, "is whether a reasonable alternative design would, at reasonable cost, have reduced the foreseeable risk of harm posed by the product and, if so, whether the omission of the alternative design by the seller or a predecessor in the distributive chain rendered the product not reasonably safe." *Id.* § 2 cmt d.

To determine whether a product is reasonably safe, the trier of fact is required to weigh the costs and benefits of the product design; a product is "not reasonably safe" if "a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Voss*, 59 N.Y.2d at 108; *see also Robinson v. Reed-Prentice Division of Package Machinery Co.*, 49 N.Y.2d 471, 479 (N.Y. 1980) ("[A] defectively designed product is one … whose utility does not outweigh the danger inherent in its introduction into the stream of commerce"). This analysis "is rooted in a recognition that there are risks and benefits associated with many products and that there are instances in which a product's inherent dangers cannot be eliminated without simultaneously compromising or completely nullifying its benefits." *Denny*, 87 N.Y.2d at 257. "The plaintiff, of course, is under an obligation to present evidence that the product, as designed, was not reasonably safe because there was a substantial likelihood of harm and it was feasible to design the product in a safer manner." *Voss*, 59 N.Y.2d at 108. "The defendant manufacturer, on the other hand, may present evidence in opposition seeking to show that the product is a safe product – that is, one whose utility outweighs its risks when the product has been designed so that the risks are reduced to the

greatest extent possible while retaining the product's inherent usefulness at an acceptable cost." *Id.* "The ultimate issue is whether the product is *reasonably safe*," not whether it is "optimally safe" or "incorporated the safest possible features." *Colon*, 199 F.Supp.2d at 84 (emphasis added).

To prove that a product design creates a "substantial likelihood of harm," a plaintiff is often required to rely on expert testimony. *See Guarascio v. Drake Associates, Inc.*, 582 F.Supp.2d 459, 463 (S.D.N.Y. 2008) ("New York courts uniformly rule that competent, non-conclusory expert testimony is needed in cases involving more complex design issues"). The expert may establish that a product was unreasonably dangerous by showing, for example, that it violated applicable industry standards or accepted practices, or by providing statistics showing the frequency of injuries arising out of the use of the product. *See June v. Lift-A-Loft Equipment*, No. 88-CV-1205 (NPM), 1992 WL 168181, at *5 (N.D.N.Y. Jun. 13, 1992); *Spiconardi v. Macy's East, Inc.*, 83 A.D.3d 472, 473 (N.Y. App. Div. 1st Dept. 2011); *D'Auguste v. Shanty Hollow Corp.*, 26 A.D.3d 403, 404 (N.Y. App. Div. 2d Dept. 2006). In the absence of such "foundational facts," an expert's "bare, conclusory statement" that a product is defective has no probative force. *Fallon v. Clifford B. Hannay & Son, Inc.*, 153 A.D.2d 95, 101-102 (N.Y. App. Div. 3d Dept. 1989); *see also D'Auguste*, 26 A.D.3d at 404. The requirement under New York law that an expert's opinion be grounded in 'foundational facts' is closely related to the requirement under Federal Rule of Evidence 702 that the opinion be based on "sufficient facts and data" and "reliable principles and methods." Fed. R. Evid. 702.

In addition to showing that a product design creates a substantial likelihood of harm, the plaintiff must prove that there existed a feasible alternative design. Failure to proffer an alternative design is fatal to a design defect claim. *See Greenberg v. Larox, Incorporated*, 673

Fed. Appx. 66, 69-70 (2d Cir. 2016) (summary order) ("Summary judgment on the design defect claim, however, was nonetheless warranted because Greenberg failed to submit evidence that Larox could have designed a safer version of its product"); Aaron D. Twerski & James A. Henderson, Jr., *Manufacturers' Liability for Defective Product Designs: The Triumph of Risk-Utility*, 74 Brook. L. Rev. 1061, 1093 & n. 139 (2009) ("[T]he case law in New York is replete with decisions by courts that defendants are entitled to summary judgment because plaintiffs failed to introduce credible evidence of a reasonable alternative design") (collecting cases). Because the availability of a reasonable alternative design depends on factors such as "production costs," "product longevity, maintenance, repair, and [a]esthetics," Restatement § 2 cmt f, it must generally be imparted through the testimony of an expert. *See Cuntan*, 2009 WL 3334364, at *6 ("Under New York law, a plaintiff seeking to establish a design defect is generally required to provide expert testimony as to the feasibility and efficacy of alternative designs") (collecting cases). "There are two means of proving the existence of a feasible alternative: the expert (1) 'can show, through testing and construction of a prototype, that such an alternative design is within the realm of practical engineering feasibility, thereby demonstrating the utility, cost, safety, sanitation and other characteristics of the proposed alternative; and/or (2) [the expert] can identify makers of similar equipment who have already put into use the alternative design that has been proposed.' " *Erazo v. SCM Group North America*, No. 16-CV-2386 (RRM) (RER), 2019 WL 1044365, at *21 (E.D.N.Y. Mar. 5, 2019) (citing *Rypkema v. Time Mfg. Co.*, 263 F.Supp.2d 687, 692 (S.D.N.Y. 2003)). "[T]he touchstone of an expert's report should be a comparison of the utility and cost of the product's design and alternative designs." *Lara v. Delta International Machinery Corp.*, 174 F.Supp.3d 719, 736 (E.D.N.Y. 2016) (quoting *Hilaire*, 54 F.Supp.3d at 244).

B.     *Noncompliance with product safety statutes or regulations*

A plaintiff may establish that a product design is defective by showing that it violates applicable product safety laws. In this regard, under New York law, it matters whether the violation is statutory or regulatory in nature. A product's noncompliance with an applicable product safety statute renders the product defective per se where "it can be shown that [the] plaintiff belongs to the class of legislatively intended beneficiaries and that a right of action would be clearly in furtherance of the legislative purpose." *Sita v. Danek Medical, Inc.*, 43 F.Supp.2d 245, 262 (E.D.N.Y. 1999) (quoting *CPC International Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276 (N.Y. 1987)). )). By contrast, regulatory violations are evidence of a defect, but do not constitute a defect per se. *See Cappellini v. McCabe Powers Body Co.*, 713 F.2d 1, 4-5 (2d Cir. 1983) ("Under New York law … , which applies to this diversity action, a regulatory violation does 'not establish negligence *per se*, but merely constitutes some evidence of negligence, which the jury could take into consideration with all other evidence bearing on that subject' ") (citing *Schumer v. Caplin*, 241 N.Y. 346, 351 (N.Y. 1925) and *Conte v. Large Scale Development Corporation*, 10 N.Y.2d 20, 29 (N.Y. 1961)). *See also Montalvo v. Rheem Textile Systems, Inc.*, No. 86-CV-9501 (SWK), 1991 WL 52777, at *3 (S.D.N.Y. Apr. 4, 1991).[11]

Even where a plaintiff has established that a product was defective by virtue of its noncompliance with applicable statutes or regulations, they must still prove that this defect was the cause of their injury. *See, generally, Martin v. Herzog*, 228 N.Y. 164, 170 (N.Y. 1920) ("Proof of negligence in the air, so to speak, will not do") (citation and quotation marks omitted).

---

[11] New York law differs from both the Restatement and "[t]he overwhelming majority of American courts," which hold that "violations of product safety regulations cause products to be defective as a matter of law." Reporter's Note to Restatement § 4 cmt d; *cf.* Restatement § 4(a).

2. <u>Circumstantial evidence of a design and/or manufacturing defect</u>

A plaintiff who cannot prove a specific design or manufacturing defect through expert testimony or other direct evidence may nonetheless prevail on the basis of circumstantial evidence alone. *See Ramos v. Howard Industries, Inc.*, 10 N.Y.3d 218, 223 (N.Y. 2008) ("[I]t is well settled that a products liability cause of action may be proven by circumstantial evidence, and thus, a plaintiff need not identify a specific product defect") (quoting *Speller*, 100 N.Y.2d at 41); *Jarvis v. Ford Motor Co.*, 283 F.3d 33, 44 (2d Cir. 2002) (Sotomayor, J.) (recognizing "the settled principle of New York law that a plaintiff in a products liability action is not required to prove a specific defect when a defect may be inferred from proof that the product did not perform as intended by the manufacturer"). Under this circumstantial approach, "in order to proceed in the absence of evidence identifying a specific flaw, a plaintiff must prove that the product did not perform as intended and exclude all other causes for the product's failure that are not attributable to defendants." *Riegel v. Medtronic, Inc.*, 451 F.3d 104, 125 (2d Cir. 2006) (quoting *Speller*, 100 N.Y.2d at 41). A more formal statement of the rule, set forth in the Restatement and endorsed by the New York Court of Appeals, is as follows:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
>
> (a)     was of a kind that ordinarily occurs as a result of product defect; and
>
> (b)     was not, in the particular case, solely the result of causes other than the product defect existing at the time of sale or distribution.

*Speller*, 100 N.Y.2d at 42 (quoting Restatement § 3); *see also id.* at 41 ("In this regard, New York law is consistent with the Restatement[.]"). In contrast to the mode of proof identified in Discussion I.1, *supra*, a plaintiff attempting to demonstrate a product defect circumstantially

"need not explain specifically what constituent part of the product failed." Restatement § 3 cmt c.

This rule traces its historical antecedents to the law of negligence and the doctrine of *res ipsa loquitur*, which permits a trier of fact to infer that the harm suffered by a plaintiff was caused by the negligence of the defendant when the event is of a kind that ordinarily does not occur in the absence of negligence and other responsible causes are eliminated by the evidence. *See id.* § 3 cmt a & Reporter's Note (citing Restatement (Second) of Torts § 328D (1965)). This doctrine recognizes that, generally, in the absence of a defect, chairs do not suddenly collapse,[12] bicycles do not randomly snap apart,[13] and kitchen appliances do not spontaneously combust.[14] When such extraordinary events occur, the factfinder may infer that there was *something* wrong with the product, even if the precise mechanism at fault cannot be identified.

Under this circumstantial approach, the plaintiff must first establish that the injury "was of a kind that ordinarily occurs as a result of a product defect," *Speller*, 100 N.Y.2d at 42; Restatement § 3(a), which may be inferred where "the product did not perform as intended," *Riegel,* 451 F.3d at 125; *Jarvis*, 283 F.3d at 44; *Speller*, 100 N.Y.2d at 41; *Halloran v. Virginia Chems.*, 41 N.Y.2d 386, 388 (N.Y. 1977). The burden then shifts to the defendant to propose an alternative explanation for the harm, one that does *not* implicate a product defect. *See Sanchez v. Stanley-Bostitsch, Inc.*, No. 98-CV-494 (LMM), 2000 WL 968776, at *3 (S.D.N.Y. Jul. 13, 2000) ("… Stanley argues that the case should be dismissed because Sanchez has not met its

---

[12] *See, e.g., Winckel v. Atlantic Rentals & Sales, Inc.*, 159 A.D.2d 124 (N.Y. App. Div. 2d Dept. 1990).

[13] *See, e.g., Lynch v. Trek Bicycle Corp.*, No. 01-CV-3651 (DAB) (JCF), 2011 WL 1327032, at *4 (S.D.N.Y. Mar. 30, 2011).

[14] *See, e.g., Speller*, *supra*.

burden of excluding all other possible causes of the accident not attributable to the defendant. However, to support such an argument, a defendant bears its own burden of offering some 'evidence in admissible form establishing that the plaintiff's injuries were not caused by a … defect in the product' ") (internal citations and alterations omitted) (quoting *Graham v. Walter S. Pratt & Sons*, 706 271 A.D.2d 854, 854 (N.Y. App. Div. 3d Dept. 2000)); *see also Florentino v. American Lifts*, No. 06-CV-3553 (BMC) (MDG), 2008 WL 11417177, at *8 (E.D.N.Y. Apr. 15, 2008); *Giordano v. PGT Industries, Inc.*, No. 04-CV-9246 (WCC), 2007 WL 4233002, at *5 (S.D.N.Y. Nov. 30, 2007); *LaBarge v. Joslyn Clark Controls, Inc.*, No. 03-CV-169S, 2006 WL 2795612, at *7 (W.D.N.Y. Sept. 26, 2006). If the defendant fails to proffer any such alternative explanations, then the plaintiff has raised a genuine issue of material fact in support of its product defect claim, and summary judgment in the defendant's favor should be denied. *See Florentino*, 2008 WL 11417177, at *8-*9; *Giordano*, 2007 WL 4233002, at *5; *Peris v. Western Regional Off-Track Betting Corp.*, 255 A.D.2d 899, 899 (N.Y. App. Div. 4th Dept. 1998).

## II. Motion to Preclude Expert Testimony Pursuant to Federal Rule of Evidence 702

Plaintiff's claim that the TPMS Design is defective relies in large part on the proposed opinions of Leiss. Defendant moves to preclude Leiss' opinions under Federal Rule of Evidence 702.

### 1. Standard of review

"The Federal Rules of Evidence assign to [the district court] 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.' " *U.S. v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (quoting *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). To that end, Federal Rule of Evidence 702 provides that:

> [A] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the experts has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The proponent of the expert testimony bears the burden of "establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *Williams*, 506 F.3d at 160. The standards governing admissibility under Rule 702 have been described as "liberal and flexible," *Hilaire*, 54 F.Supp.3d at 234; *Houlihan v. Marriott Intern., Inc.*, No. 00-CV-7439 (RCC), 2003 WL 22271206, at *3 (S.D.N.Y. Sept. 30, 2003), embracing a general "presumption of admissibility," *Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir. 1995), pursuant to which rejection of expert testimony is "the exception rather than the rule," *Melini v. 71st Lexington Corp.*, No. 07-CV-701 (JCF), 2009 WL 413608, at *5 (S.D.N.Y. Feb. 13, 2009); Advisory Committee Note to 2000 Amendments to Rule 702. Nevertheless, the court's gatekeeping role demands that it exclude expert testimony "if it is speculative or conjectural," *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, (2d Cir. 2008) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)), "without factual basis," *id.*, or "purely conclusory," *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 142 (2d Cir. 2000), or where "there is simply too great an analytical gap between the data and the opinion proffered," *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

2.      Analysis under Rule 702

A.      *Leiss' qualifications*

Leiss holds a Bachelor of Science in mechanical engineering from Lawrence Technological University. (*See* Leiss Rep. at 18). As of the date of his report, he has nine years of experience in the "design, development, and manufacturing of production vehicles," which "covers most facets of bringing a newly designed automobile from an idea to mass manufacture and sale. (*Id*. at 2). His curriculum vitae indicates that he was employed as an engineer for General Motors in 1999 and for Chrysler from 1999 to 2007, and has performed litigation-related investigations involving vehicle defects since 2007. (*See id.* at 16-18). He is a licensed engineer in Connecticut and New York, a certified vehicle fire investigator, and a certified fire and explosion investigator. (*See* Leiss Dep. at 214:5-15).

While working at Chrysler, Leiss was "involved in the design" of the tire pressure monitoring systems of the Dodge Durango and Chrysler Aspen. (*Id.* at 50:11-13; Leiss Rep. at 12). His work on these systems mainly involved testing prototype vehicles, "catalog[ing] any issues"—such as whether the TPMS systems were accurately displaying warnings for low tire pressure events—and "mak[ing] sure that they were properly addressed." (Leiss Dep. at 54:12-57:5). Leiss was not involved in testing the systems for "compliance with any regulations or requirements," such as FMVSS 138. (*Id.* at 56:9-12; *see id.* at 96:7-11). Instead, his experience touched on such matters as "what [the tire pressure monitoring systems] need[ed] to look and feel like." (*Id.* at 96:18-19). As of the date of his deposition, Leiss had no training on FMVSS 138 and had not worked on any cases "pertaining to tire pressure monitoring systems" prior to this case. (*Id.* at 96:2-6, 96:23-25). He has never previously been accepted by a court as an expert

on tire pressure monitoring systems or FMVSS 138 compliance, nor has he previously been excluded by a court on those topics. (*See id.* at 86:14-22.)

Although Leiss testified that he had experience designing and testing TPMS systems generally, it does not appear that he has specific experience with TPMS systems, such as BMW's, that have a manual reset feature. The two TPMS systems that he worked on while at Chrysler both lacked a manual reset feature. (*See* Leiss Rep. at 12; Leiss Dep. at 187:18-190:2). He also testified that "the vast majority of the models that I know of and am familiar with … do not have a manual reset feature." (Leiss Dep. at 241:13-16). In addition, it is uncertain whether Leiss even understands the underlying mechanics of the 2012 BMW X3's reset feature. To be sure, some of his deposition answers indicate that he has a basic understanding of the purpose and function of the reset feature. For example, he testified that "by resetting after you have now reinflated the tire, … you are now telling the system that all of the tires are within their prescribed … inflation pressures and so any deviation from what it sees now should be construed as a loss of air, or a loss of pressure." (Leiss Dep. at 136:23-137:6; *see also id.* at 137:10-12). But later in his deposition, when asked whether he understood that resetting the TPMS while the tires are at 30 psi would "recalibrate[] the vehicle to see 30 psi as the new baseline pressure," Leiss responded that he didn't "know" whether "that means that it's going to tell it that 30 is the new norm" because "it may just be getting an electronic signal from that sensor and it may not be correlated to any certain psi." (Leiss Dep. at 138:15-139:4). Leiss was then prompted by Defendant's counsel: "[Y]ou don't see it necessarily as a recalibration, because you're saying it's sort of a black box to you, you don't really know what's going on behind the scenes" (*id.* at 139:9-12), to which Leiss replied, "Correct" (*id.* at 139:13).

In light of Leiss' professional experience, the Court finds that he is competent to testify about tire pressure monitoring systems generally, but that he is not qualified to testify about TPMS systems with manual reset features in particular. Specifically, the Court has seen nothing which would qualify Leiss to testify about how manual reset features work 'under the hood'— their internal mechanics, how they interact with other components of an automobile, whether they are necessary or desirable in certain automobile models, the possible ways in which they can be designed, and the trade-offs (in cost, functionality, utility, etc.) inherent in such design choices. Nor has Plaintiff shown that Leiss' experience designing and testing tire pressure monitoring systems *without* manual reset features would fill these gaps. It is true that "[a]n expert need not be precluded 'from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute.' " *Hilaire*, 54 F.Supp.3d at 236 (quoting *Yaccarino v. Motor Coach Indus., Inc.*, No. 03-CV-4527 (RLM) (CPS), 2006 WL 5230033, at *9 (E.D.N.Y. Sept. 29, 2006)); *see also id.* ("[W]here an expert possesses qualifications in a 'general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks experience in the specialized areas that are directly pertinent.' ") (quoting *Deutsch v. Novartis Pharm. Corp.*, 768 F.Supp.2d 420, 425 (E.D.N.Y. 2011)). But in this case, Leiss conceded that the internal workings of the 2012 BMW X3's reset feature were a "black box" to him. (Leiss Dep. at 139:9-13). He has, to put it simply, disclaimed expertise on that particular subject.

Additionally, Leiss is not qualified to opine on questions concerning tire safety— including the air pressure at which it is likely that a tire could come apart or spark a fire. Indeed, Leiss conceded that questions concerning the pressure at which a tire would become "flat" or "extremely deflated" fall outside of the scope of his expertise (*id.* at 152:8-9, 153:5-6) and that

he had to consult a separate expert to determine whether driving at certain tire pressures can cause damage to a vehicle (*see id.* at 153:11-154:14).[15]

## B. *Reliability of Leiss' opinions*

To the extent that Leiss has "crossed the foundational threshold of establishing his personal background qualifications as an expert," he must provide further foundation "as to the validity and reliability of his theories" in order for his conclusions to be admissible under Rule 702. *Hilaire*, 54 F.Supp.3d at 242 (citations and internal quotation marks omitted). "[R]egardless of an expert's experience and his expertise, the court must still perform its gatekeeping function and examine the methodology used by the expert in reaching his opinion in order to determine if it is 'reliable' and will assist the jury." *Id.* at 243 (quoting *Kumho Tire*, 526 U.S. at 149); *see also Borgognone v. Trump Plaza*, No. 98-CV-6139 (ILG), 2000 WL 341135, at *5 (E.D.N.Y. Mar. 9, 2000) ("An expert, no matter how sterling his credentials, must make clear in his proffer the methods and standards he proposes to apply in arriving at his opinions and evaluations, and must make clear in doing so that those methods and standards are reliable….").

It should be emphasized once again that Defendant does not dispute Leiss' factual determinations regarding the operation of the 2012 BMW X3's TPMS—that it can be reset while a tire is deflated and will fail to detect the low pressure condition after being reset in such a manner. (*See* Leiss Rep. at 14; *see also* Yeldham Supp. Rep. at 2 (stating that this finding comes as "no surprise")). Rather, Defendant's real dispute is with Leiss' subjective opinion that this feature "renders the system defective" (*id.* at 14) because a different system was "feasible" to be installed (*id.* at 13). Defendant also disputes Leiss' inference that this feature of the 2012 BMW X3's TPMS was an actual "cause" of the fire. (*Id.* at 14).

---

[15] No report or testimony by this unnamed tire safety expert has been produced.

Neither Leiss' opinions regarding defectiveness, nor his conclusions as to causation, derive from any scientific principles or methodology—that is, the "formulating and testing a hypothesis, conducting experiments, devising and employing controls, generating data, [and] reasoning from the data to derive conclusions." *Colon*, 199 F.Supp.2d at 76. In *Daubert*, the Supreme Court set forth a list of non-exhaustive factors to be considered that bear on the reliability of scientific theories and techniques:

> (1) whether a theory or technique has been or can be tested; (2) 'whether the theory or technique has been subjected to peer review and publication;' (3) the technique's 'known or potential rate of error' and 'the existence and maintenance of standards controlling the technique's operation;' and (4) whether a particular technique or theory has gained general acceptance in the scientific community.

*Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593-594); *see Almeciga v. Center for Investigative Reporting, Inc.*, 185 F.Supp.3d 401, 415 (S.D.N.Y. 2016) (noting that the four *Daubert* factors apply to "expert opinions purporting to offer scientific conclusions in particular"). None of the *Daubert* factors weigh in Leiss' favor here. His opinions concerning defectiveness, alternative design, and causation are not supported by theories which are capable of being tested, which are subject to peer review or standards controlling their operation, which have a known or potential rate of error, or which have gained general acceptance in the scientific community. Indeed, the only 'experiment' Leiss conducted was a simple test of an exemplar vehicle, which established nothing more than that which Defendant has already conceded: that it is possible to reset the TPMS at a low pressure level and thereby extinguish the warning telltale while driving at that level.[16] Neither that experiment, nor any other data disclosed in Leiss'

_____

[16] Leiss' test does not call into question the statement in Yeldham's supplemental report that the TPMS will activate a low pressure warning if the pressure in any tire drops to 23 psi or below, regardless of any attempt to reset. (*See* Yeldham Supp. Rep. at 2). This is because Leiss only tested the exemplar vehicle's TPMS by deflating the tire to 25 psi.

report or testimony, logically support the inference that this feature of the 2012 BMW X3 is "defective," a judgment which, as explained above, requires an appreciation of the gravity and severity of the risk and a balancing of those risks with the product's inherent usefulness, if any. *See* Discussion I.1, *supra*. Nor did this or any other experiment establish that misuse of the reset feature was the actual cause of the fire. Furthermore, at his deposition, Leiss was not able to clearly convey how he eliminated other hypotheses regarding the cause of the accident; it is not apparent that he even considered other hypotheses in the first place. (*See* Leiss Dep. at 175:25-176:21); *Colon*, 199 F.Supp.2d at 78-79 ("There is no general acceptance in the engineering community for a methodology that omits testing of a hypothesis. … The engineering community emphasizes the importance of testing to ensure even a modicum of reliability…."). Although he insists in his report that he "applied the scientific method" in reaching his conclusions, it is painfully clear that this was not the case. Whatever else may be said about *Daubert* and Rule 702, surely they do not stand for the proposition that an expert's methods are 'scientific' simply because the expert says so.

Of course, the mere fact that Leiss' key conclusions are not 'scientific' does not make them invalid. They may derive from some "technical" or "other specialized knowledge." Fed. R. Evid. 702. Even so, the Court is not persuaded that these conclusions are supported by adequate facts, data, or methods to render them admissible.

Leiss proffers two alternative designs which, he claims, "were technologically and economically feasible to be installed on the 2012 BMW X3" and will identify an inadequately inflated tire under all conditions. (Leiss Rep. at 13). One such proposal—a manual reset feature that will "alert the operator to a low tire inflation pressure, even if [the TPMS is] reset" (*id.*)—can be rejected out of hand, as Leiss has not demonstrated that this technology was available

prior to the 2012 model year. Although Leiss insists that there were TPMS systems "on the market" prior to 2012 that employed such technology, the only concrete example he gives is the 2016 BMW X3, a *subsequent* model year. (*Id.* at 12-13). Additionally, Leiss makes no attempt to explain how such technology would work.

Leiss' only other proposed alternative design is a TPMS that eliminates the manual reset feature altogether. He states that the 2007 Dodge Durango and Chrysler Aspen, the two vehicles whose TPMS systems he personally worked on, both incorporated a TPMS without a manual reset feature. (*See id.* at 12). But there is nothing, either in Leiss' report or in his deposition, that makes it clear how Leiss arrived at the conclusion that such a system would have been "feasible" to install on the 2012 BMW X3. As noted above, the underlying mechanics of the manual reset feature fall outside of the scope of Leiss' expertise, as do attendant questions of how the reset feature interacts with the vehicle's other components or whether it is necessary for this particular vehicle design. *See* Discussion II.2.A, *supra.* Leiss does not appear to have considered (or, if he has considered it, his report and testimony do not reflect) whether or not there are significant engineering differences between the 2012 BMW X3 and other vehicles that might require installation of a reset feature in the former model. Nor has Leiss disclosed any underlying facts, data, testing, or prototypes which demonstrate that the elimination of the 2012 BMW X3's reset feature would have been "within the realm of practical engineering feasibility." *Erazo*, 2019 WL 1044365, at *2; *Rypkema*, 263 F.Supp.2d at 692.

Undoubtedly, it would have been "feasible" for Defendant to eliminate the manual reset feature in the sense that it could have designed an automobile identical in every respect to the Chrysler Aspen or Dodge Durango. In that extremely narrow sense, Leiss' statement that it would have been "feasible" for Defendant to build a car without a reset feature may be granted.

But the question must then be asked: on what basis did Leiss conclude that Defendant's failure to design a vehicle like the Dodge Durango or Chrysler Aspen was "defective"? After all, the law does not decree that there is only one correct way to make an automobile.

For Leiss' conclusion that Defendant's design choices were "defective" to be admissible, Leiss would have been required to consider the magnitude and severity of any safety risks and the concomitant utility or benefits of the design vis-à-vis the available alternatives, all in accordance with what it means for a specific product design to be "defective" under New York law. *See* Discussion I.1, *supra*. No such analysis is revealed here. Although it can be inferred that there are *some* risks involved when driving with a tire whose inflation level is 75% or less than the recommended cold inflation level, Leiss does not attempt to measure or quantify this risk. Nor could he, as such questions fall squarely outside of the zone of his expertise. *See* Discussion II.2.A, *supra*. Notably, the alleged defect in the TPMS Design could only become manifest at pressure levels above 23 psi (*see* Yeldham Supp. Rep. at 2), and it is unclear whether the risk of tire failure at these levels is a particularly substantial one.[17] It is also not clear that Leiss considered whether the warnings provided in the Owner's Manual, instructing operators not to reset the TPMS until their tires have been re-inflated to their correct pressure levels, will effectively mitigate the risk that the manual reset feature will be misused. Additionally, there is uncontroverted evidence by Yeldham that the manual reset feature actually adds to the utility of the 2012 BMW X3 in at least one respect, by facilitating the option to customize the vehicle's tire types. (*See* Yeldham Supp. Rep. at 2 (the manual reset feature "is incorporated into the TPMS of the 2012 BMW X3, because this vehicle is offered in several wheel/tire combinations,

---

[17] Although Leiss is not qualified as an expert in tire safety, it is noteworthy that he did not consider 25 psi to represent a "grossly or severely" underinflated level that could "ruin" a tire. (Leiss Dep. at 149:13-18).

which do not all have the same recommended cold inflation pressures")). Leiss does not explain whether the removal of the manual reset feature would have limited the ability of a driver to customize their vehicle with different wheel/tire combinations.

In short, Leiss' opinion concerning the purported 'defectiveness' of the manual reset feature is conclusory, unsupported by adequate foundational facts, and lacking in the sort of risk-utility analysis that New York law requires. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. For these reasons, his opinion regarding defectiveness is precluded.

Leiss' opinion regarding causation fares no better. His report is completely silent as to how it is that he concluded that "[t]he defective TPMS in the 2012 BMW X3 [was] a cause of the fire in [the Subject Vehicle]." (Leiss Rep. at 14).[18] His testimony makes it clear that his conclusions regarding causation derive solely from the assumption that the Subject Vehicle's TPMS was improperly reset when it was serviced at Open Road in October 2012. (*See* Leiss Dep. at 173:11-176:21). But nothing in the record indicates that the TPMS was ever improperly reset at a low tire pressure. *See* Background III.1, *supra.* To the contrary, the mechanic who serviced the Vehicle testified, and the service record reflects, that the Vehicle's tire was re-inflated before being reset. (*See* Boehler Dep. at 110:4-23; Def. Ex. R at 4). Leiss' opinions regarding causation are speculative and are, therefore, excluded as well.

---

[18] Rule 26 of the Federal Rules of Civil Procedure requires an expert's report to "contain … a complete statement of all opinions the witness will express *and the basis and reasons for them*," and well as "the facts or data considered by the witness in forming them[.]" Fed. R. Civ. P. 26(a)(2)(B)(i), (ii) (emphasis added).

Finally, Leiss' opinion that the design of the 2012 BMW X3's TPMS violates FMVSS 138 (*see* Leiss Rep. at 12) hinges on a disputed point of law concerning the meaning of that regulation. *See* Discussion III.1.A, *infra*. Such legal questions are for the Court, not an expert, to resolve.

**III.    Motion for Summary Judgment**

Having precluded Leiss' testimony on the issues of defectiveness, alternative design, and causation, we proceed to analyze whether summary judgment should be granted.

As previously noted, a plaintiff alleging a design defect claim may prevail by pointing to a specific flaw in the product's design and providing evidence that the flaw (1) constitutes a design defect, *i.e.* that it is not "reasonably safe," and (2) was a "substantial factor" in causing the injury in question. *Voss*, 59 N.Y.2d at 107; Discussion I.1, *supra*. Here, the only specific defect that Plaintiff proposes is the Vehicle's manual reset feature, *i.e.*, its ability to be reset at a low tire pressure, thereby extinguishing the low tire pressure warning. Alternatively, a plaintiff may prevail on a design and/or manufacturing defect claim, without identifying a specific defect, by producing circumstantial evidence that the harm "was of a kind that ordinarily occurs as a result of product defect" and excluding any alternative explanations of the injury proffered by the defendant. *Speller*, 100 N.Y.2d at 42; Restatement § 3; *see* Discussion I.2, *supra*. We consider, as to each method of proof, whether Plaintiff has raised a triable issue of fact warranting denial of summary judgment.

1.    Plaintiff's design defect claim based on the manual reset feature

A.    *Defectiveness*

We consider first whether Plaintiff has raised a genuine issue of material fact as to whether the design of the manual reset feature is defective, *i.e.* not "reasonably safe." *Voss*, 59

N.Y.2d at 107; Discussion I.1, *supra*. Plaintiff produced two forms of evidence on this point: first, Leiss' opinion that the design is defective; and, second, the design's alleged noncompliance with FMVSS 138, which in and of itself may constitute evidence that the design is defective, *see* Discussion I.1.B, *supra*. Because the Court has excluded Leiss' testimony on the issue of defectiveness, *see* Discussion II.2.B, *supra*, our inquiry is limited to the issue of whether the design violates FMVSS 138.

Plaintiff's argument that the manual reset feature violates FMVSS 138 derives from the following provision of the regulation:

> S4.2 TPMS detection requirements. The tire pressure monitoring system must: … (b) Continue to illuminate the low pressure warning telltale as long as the pressure in any of the vehicle's tires is equal to or less than the pressure specified in S4.2(a), … or until manually reset in accordance with the vehicle manufacturer's instructions.

FMVSS 138 S4.2. Subsection S4.2(a), as previously noted, sets forth the 75% Rule, which requires the warning telltale to activate if the pressure in any tire drops to 75% of the manufacturer's recommended cold inflation pressure. *See* FMVSS 138 S4.2(a). Thus, under subsection S4.2(b), the warning must continue to illuminate unless either the tire pressure is re-inflated above 75% of the recommended cold inflation pressure or the TPMS is "manually reset in accordance with the vehicle manufacturer's instructions." But, in the case of the 2012 BMW X3, the Owner's Manual explicitly instructs operators *not* to reset their TPMS until the tire has been re-inflated to its correct pressure level. (*See* Owner's Manual at 88). Therefore, according to Plaintiff, because any attempt to reset the 2012 BMW X3's TPMS while the vehicle's tires have inadequate pressure is not "in accordance with the vehicle manufacturer's instructions," TPMS violates FMVSS 138 S4.2(b) by allowing the warning to be shut off when an operator

resets the TPMS at a pressure level that falls beneath 75% of the recommended cold inflation level. (*See* Pl. Opp. at 16).

Plaintiff's argument makes sense based on a plain, grammatical reading of the regulatory text, insofar as it seeks to give meaning to the phrase "… in accordance with the vehicle manufacturer's instructions." But a contrary interpretation is also plausible, because if the regulation were construed to require manufacturer to install TPMS systems that are incapable under any circumstances of being extinguished while the tire's inflation levels are less than 75% of the recommended cold inflation level, then the clause beginning with "… or until manually reset" would be rendered superfluous. In short, while the text of the regulation makes it clear that the agency contemplated and permitted manual reset features generally, it does not reveal whether the agency specifically intended to approve of manual reset features, like that of the 2012 BMW X3, which are capable of being reset at tire pressures less than those prescribed under the 75% Rule. Because the text of the regulation is ambiguous, we may resort to its regulatory history to clarify its intended meaning. *See Abbott Laboratories v. U.S.*, 84 Fed. Cl. 96, 103 (Fed. Cl. 2008), *aff'd*, 573 F.3d 1327 (Fed. Cir. 2009).

FMVSS 138 was promulgated by the National Highway Traffic Safety Administration (**"NHTSA"**) pursuant to the Transportation Recall Enhancement, Accountability, and Documentation Act (TREAD Act), Pub. L. No. 106-414, 114 Stat. 1800 (2000). The NHTSA published a final rule for FMVSS 138 on June 5, 2002, *see* 67 Fed. Reg. 38,704, but that rule was vacated by the Second Circuit in 2003 on grounds that are not relevant here, *see Public Citizen, Inc. v. Mineta*, 340 F.3d 39 (2d Cir. 2003). On September 16, 2004, the NHTSA published a new notice of proposed rulemaking, *see* 69 Fed. Reg. 55,896, and published the final rule, currently in effect, on April 8, 2005, *see* 70 Fed. Reg. 18,136.

During the notice and comment period prior to the April 8, 2005 final rule, commenters specifically raised concerns, mirrored by Plaintiff in this lawsuit, "regarding the possibility of a TPMS reset button extinguishing the telltale before the underlying problem (i.e., low tire pressure or system malfunction) has been corrected." 70 Fed. Reg. at 18,142. One commenter noted that drivers might "use TPMS reset buttons to extinguish the low pressure warning lamp without correcting the tire inflation problem, in order to extinguish the 'annoying' telltale," and recommended that the final rule prohibit manual reset features "that would allow consumers to recalibrate the system." *Id.* at 18,157. In the published notice of the final rule, the NHTSA "agree[d]" with this commenter "that drivers should not reset the TPMS so as to extinguish the low tire pressure warning telltale … until the underlying problem has been corrected (e.g., restoring proper inflation pressure or remedying other problems)." *Id.* But, the NHTSA stated: "We believe that vehicle manufacturers will clearly address this issue when explaining the TPMS reset feature, if applicable. We believe that no additional language is necessary on this point." *Id.*

These statements make it clear that NHTSA did not intend for the final rule to prohibit the type of TPMS design employed in the 2012 BMW X3. Instead, the NHTSA believed that the appropriate solution was for manufacturers to include language in the owner's manual instructing drivers not to reset the system until all tires have been re-inflated to their proper level. Defendant included precisely such language in the 2012 BMW X3 Owner's Manual (*see* Owner's Manual at 88), and Plaintiff does not challenge the adequacy of these warnings. Therefore, the 2012 BMW X3's manual reset feature does not violate FMVSS 138.[19]

---

[19] Although the manual reset feature complies with FMVSS 138, this alone does not render it non-defective as a matter of New York tort law. *See Hamilton v. Accu-Tek*, 935 F.Supp. 1307, 1321 (E.D.N.Y. 1996); *Palmatier v. Mr. Heater Corporation*, 159 A.D.3d 1084, 1086 (N.Y.

Accordingly, Plaintiff has failed to raise a genuine issue of material fact as to whether the manual reset feature is defective.

B.   *Causation*

Separate and apart from its failure to provide evidence showing that the manual reset feature was defective, Plaintiff failed to raise a genuine issue of fact as to causation. As the Court noted in its discussion precluding Leiss' testimony on the issue of causation, the record does not support a non-speculative inference that the failure of the low tire pressure warning to illuminate at the time of the fire was caused by the Subject Vehicle being improperly reset at the Open Road in October 2012. *See* Discussion II.2.B, *supra*.

C.   *Conclusion as to Plaintiff's design defect claim based on the manual reset feature*

For the foregoing reasons, summary judgment is granted with respect to Plaintiff's claim that its injury was caused by a design defect inherent in the Vehicle's manual reset feature.[20]

---

App. Div. 3d Dept. 2018). Furthermore, Congress has provided that "[c]ompliance with a motor vehicle safety standard prescribed under this chapter does not exempt a person from liability at common law." 49 U.S.C. § 30103. However, the Supreme Court has clarified that this "provision, by itself, does not foreclose … 'any possibility of implied conflict pre-emption.' " *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 869 (2000) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280 (1995)). In a duo of cases, *Geier*, *supra* and *Williamson v. Mazda Motor of America, Inc.*, 562 U.S. 323 (2011), the Supreme Court indicated that the question of whether a federal motor vehicle safety standard preempts a common law products liability action depends on whether allowing the common law action to proceed would "stand[] as an obstacle to the accomplishment and execution of the full purposes and objectives" of the regulation, *Williamson*, 562 U.S. at 330 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). This inquiry, in turn, demands an intensive review of "the regulation's history" and the NHTSA's "contemporaneous explanation of its objectives." *Id.* at 330, 336. Here, the preemption issue has gone completely unbriefed by the parties, and it appears from the Court's research that the preemptive effect of FMVSS 138 S4.2 would be a matter of first impression. Because the Court holds that summary judgment can be granted on alternative grounds as to Plaintiff's claim that the manual reset feature is defectively designed, it does not wade into the preemption issue here.

2. <u>Plaintiff's product defect claim based on circumstantial evidence</u>

Although the Court has precluded Leiss' testimony concerning the alleged defect in the Vehicle's manual reset feature and granted summary judgment with respect to this aspect of Plaintiff's claims, it nevertheless finds that Plaintiff is entitled to proceed to trial on the basis of circumstantial evidence of a manufacturing and/or design defect. *See Speller*, 100 N.Y.2d at 41-42; Restatement § 3; Discussion I.2, *supra*.[21] Defendant contends that "Plaintiff … needs Mr. Leiss to proffer a putative defect" and "cannot establish the existence of any defect in the subject Vehicle" without his testimony (Def. Reply at 5). But this is incorrect; even where expert testimony concerning a specific alleged defect is excluded, the circumstances of the accident alone may permit an inference of a product defect sufficient to withstand summary judgment. *See Lynch v. Trek Bicycle Corp.*, 374 Fed. Appx. 204, 207 (2d Cir. 2010) (summary order); *Lynch*, 2011 WL 1327032, at *4; *Florentino,* 2008 WL 11417177, at *8-*9.

To prevail on the basis of circumstantial evidence, Plaintiff must first establish that the incident that caused its harm "was of a kind that ordinarily occurs as a result of product defect." *Speller*, 100 N.Y.2d at 42 (quoting Restatement § 3(a)). It has done so here. Sobers' testimony, if credited, establishes that the Vehicle's TPMS failed to emit a low tire pressure warning at any point prior to the fire, which, all parties agree, was caused by a lack of adequate air pressure. Thus, a reasonable trier of fact could determine that the TPMS "did not perform as intended" and

---

[20] Because this aspect of Plaintiff's claims is dismissed, Leiss' proffered opinions, insofar as they may not be excludable under Federal Rule of Evidence 702, are no longer relevant and are therefore excluded under Rule 401.

[21] Plaintiff specifically tethers its circumstantial evidence-based argument to its "manufacturing defect" claim. (*See* Pl. Opp. at 24-26). However, as previously noted, a plaintiff proving a product defect circumstantially need not specify whether the defect was a design defect or a manufacturing defect. *See* Restatement § 3 cmt b.

infer that such a malfunction would not ordinarily occur in the absence of a defect. *Jarvis*, 283 F.3d at 44 ("[A] plaintiff in a products liability action is not required to prove a specific defect when a defect may be inferred from proof that the product did not perform as intended by the manufacturer").

Next, because Plaintiff has established that the incident was of a kind that ordinarily occurs as a result of a product defect, "[D]efendant bears [the] burden of offering some 'evidence in admissible form establishing that the plaintiff's injuries were not caused by a … defect in the product.' " *Sanchez*, 2000 WL 968776, at *3 (quoting *Graham*, 271 A.D.2d at 854); *see* Discussion I.2, *supra*. Defendant focuses exclusively on refuting Sobers' account of the event, presenting Yeldham's statement that Sobers "may have become inattentive" to the warning light (Yeldham Rep. at 12) and combing through the record for circumstantial indicators that Sobers may not have been telling the truth (*see* Def. Reply at 6).

The problem with Defendant's approach is that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson*, 477 U.S. at 255. The Court's task on summary judgment is only to decide whether a jury "could reasonably believe" the Plaintiff's evidence, *Grant*, 2019 WL 1099945, at *4, not whether the Court believes the evidence is actually credible. Even where there are substantial inconsistencies between a plaintiff's account of events and other evidence in the record, a court has no authority to usurp the role of the jury in determining whether the plaintiff's account should be credited. *See Vargas v. APL Limited*, No. 15-CV-6981 (ILG) (RML), 2019 WL 1934518, at *2 n. 8 (E.D.N.Y. May 1, 2019) (holding, on summary judgment, that various sworn statements by defendants' witnesses disputing the plaintiff's account did not make the plaintiff "an incredible witness as a matter of law," and that "any questions of fact concerning

the veracity of [the plaintiff's] testimony must be resolved in his favor"). Notwithstanding all of the evidence that Defendant has assembled to challenge Sobers' testimony that the warning light did not go on, a jury could nevertheless believe her account.

Defendant also argues that "Plaintiff … misunderstands its burden in opposition to summary judgment. BMW NA does not have the burden of proving that Ms. Sobers' misuse of the Vehicle caused the fire. Rather, in the absence of direct evidence of a specific design or manufacturing defect, Plaintiff has the burden of ruling *out* Ms. Sobers' misuse as a cause of the fire." (Def. Reply at 6) (emphasis in the original). But with all due respect to Defendant, it is they who misunderstand the burden of proof. As previously stated, and as numerous courts have held, once a plaintiff establishes that the incident occurred under circumstances ordinarily caused by a defective product, the burden falls on the defendant to proffer an alternative explanation. *See Florentino*, 2008 WL 11417177, at *8; *Giordano*, 2007 WL 4233002, at *5; *LaBarge*, , 2006 WL 2795612, at *7; *Sanchez*, 2000 WL 968776, at *3; *Graham*, 706 271 A.D.2d at 854. The only alternative explanations that the plaintiff is required to rule out are those that the *defendant* has proposed. *See Riegel*, 451 F.3d at 125 ("Thus, to overcome Medtronic's arguments and survive summary judgment, the Riegels had to come forward with competent evidence excluding *Medtronic's proffered alternative causes* as the actual origin of the catheter's rupture") (emphasis added).

Here, as noted above, Defendant has proposed only one alternative theory of this accident: that Sobers ignored or was inattentive to the warning light. Plaintiff has "rul[ed] out" this explanation by presenting Sobers' testimony that the light did not turn on, testimony which a jury could reasonably credit. Of course, the mere fact that a jury *could* credit this testimony does not mean that it *must*. At trial, Defendant will be free to persuade the jury that her account should

not be believed. For summary judgment purposes, however, Plaintiff has satisfied its burden of raising "a triable question of fact by offering competent evidence which, *if credited by the jury*, is sufficient to rebut defendant's alternative cause evidence." *Cuntan*, 2009 WL 3334364, at *9 (emphasis added) (alterations omitted) (quoting *Ramos*, 10 N.Y.3d at 223).

Finally, Defendant argues, for the first time in its reply brief, that Plaintiff's failure to pay for the storage of the Vehicle and its ensuing loss and destruction presents a "spoliation issue." (Def. Reply at 5 n. 3). Arguments raised for the first time in a reply brief will generally not be considered. *See Fisher v. Kanas*, 487 F.Supp.2d 270, 278 (E.D.N.Y. 2007). In any event, "[c]ase dispositive-sanctions ' "should be imposed only in extreme circumstances, usually after consideration of alternative, less drastic sanctions." ' " *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chemical Co., Ltd.*, 769 F.Supp.2d 269, 290 (S.D.N.Y. 2011) (quoting *Arista Records LLC*, 608 F.Supp.2d 409, 442 (S.D.N.Y. 2009) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999))). "[C]ourts are reluctant to grant a dispositive motion based solely on spoliation, and will not do so unless the discovered party acted with bad faith and willfulness and there is no other effective remedy." *In re Celestica Inc. Securities Litigation*, No. 07-CV-312 (GBD) (MHD), 2014 WL 1301881, at *2 (S.D.N.Y. Mar. 31, 2014). Here, assuming that Plaintiff acted with a "culpable state of mind" in allowing the Vehicle to be destroyed, Defendant could avail itself of the less drastic sanction of an adverse inference instruction. *Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 107 (2d Cir. 2002).

For the foregoing reasons, summary judgment is denied as to Plaintiff's design/manufacturing defect claim asserted on the basis of circumstantial evidence.

## IV.    Motion for Sanctions

Defendant moves for sanctions under Federal Rule of Civil Procedure 11 on various grounds. However, that Rule provides that "[t]he motion must be served under Rule 5" and "must not be filed or presented to the court if the challenged paper, claim, defense, contention, or denial is withdrawn or appropriately corrected within 21 days after service[.]" Fed. R. Civ. P. 11(c)(2). "The safe-harbor provision is a strict procedural requirement." *Star Mark Management, Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 175 (2d Cir. 2012). The Second Circuit has made it clear that, in order to comply with Rule 11(c)(2), a letter notifying the non-movant of a forthcoming motion for sanctions must be accompanied, at a minimum, by "a copy of [the movant's] notice of motion for sanctions." *Id.* at 176. "An informal warning in the form of a letter without service of a separate Rule 11 motion" does not qualify as service of the motion itself, and is therefore "not sufficient to trigger the 21-day safe harbor period." *Id.* at 175; *see also Gal v. Viacom International, Inc.*, 403 F.Supp.2d 294, 309 (S.D.N.Y. 2005) ("[T]he plain language of the rule states explicitly that service of the *motion itself* is required to begin the safe harbor clock—the rule says nothing about the use of letters") (emphasis added).

Here, Defendant provided Plaintiff notice of its motion for sanctions in the form of a letter dated February 22, 2018, but the record does not reflect that the letter was accompanied by a copy of the notice of motion itself, or by any other document. (*See* Def. Ex. X, ECF No. 86-27). Thus, notice of the motion was not served in accordance with Rule 11(c)(2).[22] Accordingly,

---

[22] On August 9, 2017, Defendant sent Plaintiff a memorandum of law that it purportedly intended to file in connection with a prior motion for sanctions. (*See* Def. Ex. GG, ECF No. 92-1). That memorandum was never filed with the Court and raises arguments somewhat different than those presented in the motion that Defendant now brings. Thus, the delivery of the August 9, 2017 memorandum does not constitute service, in satisfaction of Rule 11(c)(2), of the same "motion" that is now before the Court.

the Court will deny Defendant's motion, albeit without prejudice to renew in compliance with the specifications of Rule 11(c)(2).[23]

## CONCLUSION

For the foregoing reasons, (i) Leiss' testimony is **EXCLUDED**; (ii) Defendant's motion for summary judgment is (a) **GRANTED** as to Plaintiff's claim of a specific design defect relating to the Subject Vehicle's manual reset feature, and (b) **DENIED** as to Plaintiff's design/manufacturing defect claim asserted on the basis of circumstantial evidence; and (iii) Defendant's motion for sanctions is **DENIED WITHOUT PREJUDICE**.

SO ORDERED.

Dated:     Brooklyn, New York
           October 10, 2019

                                        /s_____
                                        I. Leo Glasser                    U.S.D.J.

---

[23] In its memorandum of law, Plaintiff seeks "reverse sanctions" against Defendant for allegedly bringing its sanctions motion for an improper purpose. (Pl. Opp. at 34-35). However, Plaintiff has not formally moved for sanctions. The Court may consider Plaintiff's request for reverse sanctions if a formal motion in compliance with Rule 11(c)(2) is made.